AARON DAUGHERTY, Respondent, v. LANNING-HARRIS COAL and GRAIN COMPANY, Appellant.*

Kansas City Court of Appeals.   June 16, 1924.

1. **JUDGMENT:** Trial Court in Overruling Motion to Set Aside Default Judgment Held Not to Have Exercised Its Discretion Arbitrarily. Under section 1225, Revised Statutes 1919, summons served more than thirty days before term of court commenced made case returnable at said term and there was no reason for defendant

believing that case would not be triable, or set for trial, at term at which it was required to appear, and where no excuse was shown for negligently assuming that witnesses had been subpoenaed merely to give their depositions, *held* under evidence that trial court in overruling motion to set aside judgment by default did not exercise its discretion arbitrarily.

2. ————: **Where Demurrer Was Overruled and No Application Thereafter Made for Time in Which to Answer or Plead, Defendant at Time of Entry of Judgment Held to be in Default.** Where demurrer of defendant was overruled on the 15th and no application was made for time in which to reply, the defendant, under sections 1225 and 1229, Revised Statutes 1919, was in default and remained so on the 18th following, when judgment was rendered.

3. ————: **Continuance: Engagement of Counsel in Trial of Cases in Another County no Reason for Continuing Cause or for Setting Aside Default Judgment.** The fact that counsel was busily engaged in trial of cases in another county was no reason for setting default judgment aside nor was it a ground compelling opposing counsel to agree to a continuance.

4. ————: **Failure of Court to Require Stenographer to Take Down Evidence Held Insufficient to Invalidate Default Judgment.** Failure of court to have stenographer take down evidence could not invalidate judgment nor afford ground for setting it aside; the statute merely requiring the stenographer to attend session of court "under direction of judge thereof" and it being the court who directed stenographer not to take the evidence.

*Headnotes 1. Judgments, 34 C. J., Section 573; 2. Judgments, 34 C. J., Section 379; 3. Continuances, 13 C. J., Section 52; Judgments, 34 C. J., Section 536; 4. Judgments, 34 C. J., Section 495.

Appeal from the Circuit Court of Lafayette County.— *Hon. Samuel Davis*, Judge.

AFFIRMED.

*Lyons & Ristine* for respondent.

*Charles M. Bush* and *Aull & Aull* for appellant.

TRIMBLE, P. J.—Judgment by default was rendered for $5000 against defendant, and three days later

at the same term, a motion was filed to set the judgment aside. Later in the same term an amended motion to set aside was filed and after a hearing thereon the court overruled it. From an order overruling this motion the defendant has appealed.

Plaintiff, on September 7, 1921, filed suit in the circuit court of Lafayette county, Missouri, for $10,000 damages, alleging that while employed in defendant's coal mine as the operator of an electrical coal-cutting machine using a high-tension current of electricity, he was injured through the negligence of defendant in not furnishing a reasonably safe and properly insulated apparatus, whereby a "short circuit" was created and an intensely hot and binding flash was thrown out, injuring plaintiff's eyes and permanently impairing his vision.

Next day, September 8, 1921, summons was issued and served on Schlegel, an agent in charge of defendant's office in Lafayette county, the president or other chief officer not being found in said county. The writ of summons commanded defendant to appear on the first day of the next term, which was Monday, October 10, 1921.

Evidently, defendant turned the service papers over to its liability insurance company, for, on Tuesday, October 4, 1921, the Adjuster for the Maryland Casualty Insurance Company at Kansas City delivered the papers to the law office of Mr. Charles M. Bush of that city for attention, he at that time being in New York or Washington on business.

On Saturday, October 8, 1921, in the absence of Mr. Bush, his office mailed a demurrer to the clerk of the Lafayette circuit court, requesting that it be filed in the case. Said demurrer was in the usual stereotyped form saying that the petition did not state facts sufficient to constitute a cause of action.

On Tuesday, October 11, 1921, the second day of the term, the demurrer was filed by the clerk, with permission to do so obtained from the court, The clerk on the same day wrote to Mr. Bush advising him that the

demurrer had been filed and that the court had desig-
nated Saturday, October 15, 1921, as the day on which
motions and demurrers would be heard; and the letter
closed with the statement that "this is all the information
I can give you in the matter." No mention was made of
the fact that the case was on the docket *for trial* on Tues-
day, October 18th, and, as will hereinafter appear, Mr.
Bush says he did not know this, never having received
any docket or other notice to that effect. The clerk's
letter to Mr. Bush was received by him on Wednesday,
October 12, 1921, he having returned from Washington
on the evening of October 11th, that being the first date
he says he knew of the suit having been filed.

On the morning of October 12th, Mr. Bush entered
upon the trial of a case in the circuit court of Jackson
county, Missouri, and continued therein until the after-
noon of Friday, October 14, 1921, when he was notified of
the setting of another case in the same court on Monday,
October 17th, and, throughout the Saturday and Sunday
intervening, he made preparation for the trial thereof,
and on Monday morning the 17th he entered upon the
trial of that case and continued therein until the after-
noon of Wednesday, October 19, 1921.

In the meantime, the circuit court of Lafayette coun-
ty, on Saturday, October 15th, overruled the demurrer,
the order merely reciting that the demurrer "is by the
court overruled." No order was made fixing time in
which further pleading could be filed.

On the day on which the case was on the docket for
trial, Tuesday, October 18, 1921, the plaintiff appeared
with witnesses and the court rendered judgment for
plaintiff in the sum of $5000, the judgment entry first re-
citing that—"On this day comes the plaintiff by his at-
torney and it appearing to the court from the record
that the defendant has been duly served with process
and summons more than thirty days before the com-
mencement of the first day of this term of court, and
that defendant in answer to said process and summons

duly entered its appearance by filing a general demurrer to the plaintiff's petition, which demurrer was heretofore overruled, and the defendant having failed to plead further or answer the plaintiff's petition within the time required by law and the rules of this court, comes not, whereupon on motion of plaintiff's attorneys the cause is duly taken up and thereupon the plaintiff by his attorneys waives a jury and submits the cause to the court upon the pleadings and proof adduced, and the court after hearing the evidence and being fully advised in the premises doth find the issues for the plaintiff and against the defendant and doth assess the plaintiff's damages 'at the sum of five thousand ($5000) dollars.''

The amended motion (which is merely an amplification of the original motion to set aside the default), set up the following grounds:

1. That the demurrer was overruled on Saturday, October 15th, and thereafter, on Tuesday, October 18th, at about 9:30 a. m., judgment by default was rendered "before, in the opinion of counsel for defendant, time had expired for defendant to plead further."

2. That counsel for defendant thought the same time was allowed to plead or answer in the circuit court of Lafayette county as in Jackson county and that three days were allowed by the statute to plead or answer, and did not know that Lafayette was a county of less than 40,000, and was honestly mistaken in thinking the same time was allowed to plead or answer. But had an answer been filed on the same day the demurrer was overruled, "the result would have been the same, because on account of the unavoidable absence of counsel for defendant judgment by default would have been taken." That in Jackson circuit court the time for pleading to a petition is three days from the return day of the summons, and after demurrer is overruled the same time is allowed unless the court allows further time, as shown by Rule 7 of the Jackson circuit court as follows:

''When a petition, answer or reply shall be adjudged insufficient in whole or in part, upon demurrer, or the

whole or some part thereof stricken out on motion, the party may file a further or like pleading within three days thereafter, unless the court shall direct the same to be filed within a shorter or longer time.

"If such a demurrer or motion shall be overruled, the party filing the same shall plead to the petition or answer, as the case may be, within three days thereafter, unless the court shall direct or permit such party to plead within a shorter or longer time."

That "defendant's counsel had never had a case before in the circuit court of Lafayette county, Missouri, and was not acquainted with the rules of that court."

3. That defendant's attorney, Chas. M. Bush, was compelled to leave for Washington and New York on important business on October 1st and did not return until October 11th; that he was compelled to enter the trial of Gerber v. Boyle Construction Co. in Division 6 of the Jackson circuit court, on the morning of October 12th and continued therein until the afternoon of Friday, October 14th, when he was notified that the case of Cole v. Norton Bros., in Division 3 was for trial on Monday morning, October 17th, and the time intervening was spent in preparation; that on Monday morning, the 17th, he entered upon that trial and continued therein until Wednesday afternoon, October 19th. That during Mr. Bush's absence from the city, the papers in the case of Daugherty v. Lanning-Harris Coal and Grain Co., were on October 4, 1921, sent by the Adjuster of the Maryland Casualty Company to Mr. Bush's office for attention; that Mr. Bush had no knowledge of the pleadings in that suit until after his return; that a demurrer was mailed on Saturday, October 8th, to the clerk of the Lafayette circuit court which for some reason was not filed by him until October 11th although Lexington was only forty-four miles away; that on the 11th the clerk wrote Mr. Bush the demurrer had been filed, and that the court had designated Saturday, October 15th, to hear motions and demurrers, and concluded his letter by saying,

"This is all the information I can give you in the matter."

4.    That, on Monday, October 17th, L. D. Lanning, an officer of defendant, informed H. S. Nelson, who had theretofore negotiated with plaintiff's attorney for settlement, that plaintiff had subpoenaed Alex. Schlegel, one of defendant's employees, and asked Nelson what to do, and after discussion concluded that depositions were to be taken at Lexington on Tuesday, October 18th; that neither Lanning nor Nelson knew that the case had been set for trial; that Nelson called Miss Redd, Secretary to Mr. Bush, and informed her that depositions were to be taken at Lexington the following morning; that thereupon Miss Redd called the firm of Lyons & Ristine at Lexington, plaintiff's attorneys, and informed Mr. Ristine that Bush was engaged in the trial of a case in the Jackson circuit court at Kansas City, and could not be in Lexington on the day set for the taking of depositions, and asked him if they could not be continued and also asked him if notice had been given for the taking of said depositions, and that Mr. Ristine, in reply to questions concerning the notice, said, "I can't say as to that," and said he had several cases to try and evaded her questions.

5.    That on Tuesday morning, October 18th, Nelson, the adjuster, started to Lexington to arrange for the continuation of the taking of depositions, if any, and to obtain an order extending the time to plead; that he reached Lexington about 10 a. m. and went to the office of Lyons & Ristine and inquired of Mr. Ristine as to the depositions and learned that judgment by default had been taken.

6.    That Charles M. Bush would have been in Lexington at the opening of court on the 18th "if he had not been unavoidably detained in the actual trial of a case in the circuit court of Jackson county" and would have obtained the proper order protecting his client's interests.

7. That Carl L. Ristine, one of plaintiff's attorneys, stated in open court that ''defendant was going to stand on demurrer'' and led the Judge to believe such was the case, but that under no circumstances would this have been done, but that in due time pleadings would have been filed, answer made and issue joined, and had defendant or any representative known the case was set for trial on Tuesday, October 18th, proper steps would have been taken to prevent trial in the absence of counsel for defendant.

8. That defendant had no knowledge whatever of the setting of said case for trial; that a copy of the printed docket of the October term of the Lafayette circuit court had not been sent to counsel for defendant, that Mr. Bush's name was not on the docket; that the clerk had not notified Bush or defendant that the case was set for trial; that the docket was printed before the demurrer was filed and counsel for defendant had reliance that notice of the setting of said case would be given.

9. That when the default judgment was rendered, a jury was waived, and the only evidence heard was as to plaintiff's injuries and no evidence was introduced as to defendant's negligence; that no evidence at all was taken by the court stenographer; and that plaintiff's attorney twice requested the court stenographer not to take the evidence.

10. That the judgment for $5000 is grossly excessive and not based on the evidence.

11. That Chas. M. Bush had due authority to make the application to set the judgment aside.

12. That defendant has a good and meritorious defense to the alleged cause of action in that if plaintiff received any injuries they were directly caused and contributed to by plaintiff himself in that he failed to exercise ordinary care for his own safety and negligently inserted the plugs in the machinery when the trolley was still on the wire, and failed to use his eyes and other senses to prevent being injured, and carelessly handled

the machine in question; that he knew the danger of the work and assumed the risk, was not hurt and was not damaged, nor entitled to a judgment in any amount.

This motion was heard partly on affidavits filed in support of and in opposition to it, and partly upon oral testimony of witnesses introduced for and against the motion.

It seems that, theretofore, owing to differences existing between the circuit clerk and one of the attorneys for plaintiff, said attorney had been in the habit of securing the attendance of witnesses in the circuit court on subpoena issued by a notary public, instead of having them issued by the clerk; and, in accordance with that custom, after the demurrer was overruled, he had a notary public to issue subpoenas for the witnesses to attend the trial on Tuesday, October 18th. One of these subpoenas was in the forenoon of October 17th, served on Schlegel, the bookkeeper of defendant in its office at Wellington in Lafayette county where its coal mine is located, the defendant's principal office being in Kansas City.

According to Schlegel's affidavit, he at once called up Lanning, the Vice-president and Treasurer of the defendant in Kansas City, and informed him that he had been subpoenaed. He says that the Vice-president and Treasurer asked him whether he had been subpoenaed to give his deposition or to appear as a witness at the trial; that he was confused in his own mind as to which it was, because the subpoena was signed by a notary public; that he had never before seen a circuit court subpoena signed by a notary public, but he did not tell the Vice-president whether the subpoena was for the one purpose or the other; that the Vice-president told him, if he had been subpoenaed, to appear; that he, the bookkeeper, did not call the trial attorney because he did not know who he was; that later in the day the Vice-president called him and told him depositions were to be taken.

The Vice-president's affidavit says that the book-keeper called him up and, when asked whether he had been subpoenaed to give his deposition or to attend trial, the bookkeeper did not know and could not say which, definitely; that he, the Vice-president, immediately called the Maryland Casualty Insurance Company's office and talked to its adjuster, Mr. Nelson, and "asked him if the case was to be tried the following day or if it was simply the matter of taking depositions;" that the adjuster told him he was "positive the case was not going to be tried" and that he did not know of depositions being taken but would call him later; that the adjuster called him within an hour after and told him the case would not be tried the following day and that the subpoena had been for depositions. The Vice-president says he then called Schlegel, the bookkeeper, who, he said, is not an officer of the company, and told him that depositions were going to be taken. He further swore that he did not know the case was set for trial on the 18th; that Nelson, the adjuster, was not connected with the law office of Mr. Bush, nor does he engage in the trial of cases; that Mr. Bush tries cases in which the Maryland Casualty Company is interested only after they are turned over to him by the Casualty Company.

The affidavit of Nelson, the adjuster, states that he has no connection whatever with Bush's law office, except that after suit is brought he causes the summons and petition to be turned over to Mr. Bush's office; that he does not engage in the trial of cases; that he was not an attorney of record in any case, nor in this case, though he is an attorney admitted to the bar.

The affidavit of Nelson, the adjuster, further states that on Monday, October 17th, the Vice-president of defendant called him over the telephone and told him of the telephone message received from the bookkeeper; that he, Nelson, told the Vice-president he "was of the opinion" that the subpoena was for the purpose of taking depositions; that the Casualty Company had never been

notified of the setting of the case for trial and therefore
he "concluded it was for the purpose of taking deposi-
tions;" that he called up Bush's office and learned that
he was engaged in the trial of a case in the circuit court
of Jackson county, and thereupon he told Miss Redd,
Stenographer of Mr. Bush, that the bookkeeper at Wel-
lington had been subpoenaed and that he "thought depo-
sitions were to be taken in Lexington the following morn-
ing;" that she asked him if he had a copy of the notice
and he told her it must have been served down at Welling-
ton; that he then called the Vice-president over the tele-
phone and told him "it must be depositions that were go-
ing to be taken at Lexington." The adjuster further says
that Miss Redd told him that she had called Col. Ristine,
one of the attorneys for the plaintiff, but "could get no
satisfaction from him," that "he refused to a continu-
ance;" that later in the day he, the adjuster, agreed with
Miss Redd that he would go to Lexington the next morn-
ing, October 18th, "in connection with the postponement
of the taking of depositions and get an extension of time
for the defendant to plead;" that he left early the morn-
ing of the 18th in an automobile for Lexington, and, as
the road lay through Wellington, he stopped at the offices
of the defendant and found that the men there had gone
to Lexington; that he thereupon went to Col. Ristine's
office in Lexington, arriving there between 9:30 and 10
o'clock a. m., and asked for the men and, being told they
were gone, he asked if the depositions had already been
taken and was told that a default judgment had been
rendered; that he went to the courthouse and found that
such had been done, and he thereupon notified Bush's
office.

The affidavit of Miss Redd, the stenographer, states
that on Monday morning, October 17th, she was "ad-
vised that depositions were going to be taken at Lexing-
ton." By whom, she does not say, but presumably it
was by Nelson. Her affidavit further says that she im-
mediately talked to Col. Ristine over the long distance

telephone and "asked if he would not continue the tak-
ing of depositions;" that he replied he "was busy in the
trial of cases and could not agree to a continuance of
anything;" that from the conversation she "concluded
he was referring to the taking of depositions and was
not informed in any manner by him that the above-men-
tioned case was set for trial or that he would attempt
to take a judgment by default, or that he was going to
introduce any evidence in the above entitled cause;" that
inasmuch as her conversation with Ristine was "not
satisfactory," Nelson, the adjuster, was asked to go to
Lexington the next morning (Tuesday) and "if possible,
make arrangements with the attorney for plaintiff for
the continuance of the taking of any depositions, and,
also, to obtain an extension of time to plead in the case."

The affidavit of Mr. Bush states that he filed a de-
murrer in the case and received notice that it would be
acted upon on Saturday, October 15th, and that he was not
able to argue it because of being engaged in court in
Kansas City; that he was of the opinion that, under the
rules of court and statutes of the state, he had three days
in which to plead further and intended to ask for further
time in which to plead and that he intended to file a mo-
tion to make more definite and certain, as the petition
did not state facts sufficient to fully advise the defend-
ant of the alleged negligence; that he was engaged in
court as hereinbefore set forth; that at the noon recess
on Monday, October 17th, Miss Redd informed him she
had been notified that depositions would be taken at Lex-
ington and had talked with Col. Ristine relative to con-
tinuing the taking of deposition to such time as Mr.
Bush might be present, but that she "could not get any
satisfaction, inasmuch as he answered her in an evasive
manner;" that he, Bush, thereupon told her to have Nel-
son go to Lexington the next morning and arrange for
the continuation of taking of depositions and to also ask
for an extension of time in which to plead further; that
he had no notice of the fact that the case was set for trial

and "did not think for a moment" that the attorneys for plaintiff would not agree to a continuation of the taking of depositions and an extension of time in which to plead; that it was impossible for him to be in Lexington on account of being engaged in Kansas City.

Miss Redd also testified orally in the hearing on the motion and her evidence was further to the effect that in her telephone conversation with Col. Ristine, nothing whatever was said about a trial of the case or that a trial was to be had; that all of their talk was about deposition; that she asked him upon whom he served notice to take depositions, and he replied, "I cannot say as to that;" that she asked him to continue the depositions until Thursday and he said he "wouldn't agree to a continuance of anything."

On cross-examination, she said Col. Ristine told her Mr. Bush "wasn't in any position to ask any courtesies" in the case; that he asked her who defendant's local counsel was and she told him defendant didn't have any and that Ristine said something to the effect that they had better get local counsel and she replied that they hadn't had a chance to get local counsel; that Col. Ristine did not say he expected to call the case up the next morning; that she told Col. Ristine, in reference to the claim that Mr. Bush was not in a position to expect courtesies, that Mr. Bush had never had any dealings with him and therefore had never broken any agreement with him.

The affidavit of the clerk of the circuit court was to the effect that from his records he would say that he did not mail a docket to Mr. Bush prior to the date of the default judgment; that Mr. Bush's name as attorney for defendant did not appear on the docket of the court.

There was testimony from a member of the Lexington bar that he was present in the courtroom on the morning of the 18th when the default judgment was rendered; that when the case of Daugherty v. Lanning, etc., Grain Company, was called, the Judge asked if an an-

swer had been filed and why no pleading had been filed, and suggested that it would be a good idea to wait until the train got in, whereupon counsel for plaintiff remarked he considered it would be useless as he thought the defendant was going to stand on its demurrer. Nevertheless, the court waited five or ten minutes and then took up the case "some little time" before ten o'clock but the exact time he could not state; that afterwards he spoke to plaintiff's counsel about the default judgment, and counsel remarked that defendant had tricked him in some way as to the payment of $25 to a doctor for examination of plaintiff and that he was "glad of an opportunity to get even."

The mine superintendent of defendant testified that he did not know the case was set for trial on October 18th, but was informed that the purpose of the bookkeeper being subpoenaed was for the taking of depositions.

The affidavit of Col. Ristine states that on Monday, October 17, 1921, in a conversation over the telephone with "some woman in Kansas City," (who was Miss Redd), she said she had been informed that witnesses were summoned for the trial of the case on Tuesday, October 18th, and that as Mr. Bush was busy in court he wanted the *case* continued until Thursday, whereupon he told her they would not agree to any continuance; that Miss Redd said that attorneys always continued cases when the other side is engaged, and asked if he meant to say he would not agree to continue the case, that they only wanted it continued for a few days, and that it was "always customary" for attorneys to do so; that he told her that it was usually customary also for attorneys to live up to their agreements, but that, as an agreement had not been lived up to, they were "not entitled to any courtesies and we will not agree to any continuances," that Miss Redd then said Mr. Bush had not failed to live up to any agreement, whereupon Ristine said that his agent and representative had made certain agreements and had failed to live up to them and had

ignored all letters in relation thereto, and for her to tell Mr. Bush that because of these facts ''he was not entitled to any courtesies and we would not agree to any continuance whatever;'' that she then said Mr. Bush could not be there, and affiant asked her who defendant's local counsel was and she said they had none, and he told her it would be necessary for them to get local counsel if Mr. Bush could not be present, as the plaintiff had all of his witnesses summoned, the case was set for trial the next morning, and he would insist on the case being tried at that time; that she again urged that a continuance be agreed upon but he refused saying he would insist upon the case being tried the next morning; that the book-keeper and paymaster of the defendant and ten other employees from the mine were subpoenaed to appear for trial on the 18th; that said bookkeeper was formerly four years deputy clerk of the district court of Douglas county, in Omaha, Nebraska, a court of seven divisions, and familiar with court procedure and was fully aware that he was summoned for the trial of the case; and that all of said witnesses so summoned, including the said bookkeeper, were present in court when the case was called and submitted, and no objection was made, and that the said bookkeeper testified as a witness on behalf of plaintiff in the trial; that on the morning of October 18th, on a suggestion from the court, the case was not taken up until after the morning passenger train from Kansas City had arrived, and that upon the case being called up by one of the attorneys for plaintiff, the court asked if anyone represented the defendant and no one answered, whereupon the court asked if the attorneys for the plaintiff desired the testimony preserved, to which the attorneys replied that they did not, but would waive a jury and submit the case to the court, whereupon plaintiff introduced testimony and proved up his case and judgment was rendered; and that no notice to take depositions was ever given or served by either side and none were ever taken by either side, and no mention or sug-

gestion was ever made by either side that they contemplated or intended to take depositions.

The affidavit of Mr. Lyons, Col. Ristine's law partner, states that he was in their office and heard Ristine conduct his side of the telephone conversation with Miss Redd on October 17th and that he heard Ristine tell her "we will not agree to any continuance of the case;" that he heard Ristine further tell her defendant's attorneys had not lived up to their agreements with him, and "therefore we will not continue the case and you can tell Mr. Bush why we won't continue it;" that in the same conversation he heard Ristine ask over the phone who the defendant's local counsel was, and then heard him say, "You had better get one;" that Ristine told her they had other cases set for *Thursday* and would not agree that the case be continued, as all of plaintiff's witnesses had been subpoenaed, and it would be necessary for Mr. Bush to be in Lexington the next morning or get local counsel to represent him, as he, Ristine, would insist on its being tried.

The affidavits of Lyons & Ristine's stenographer, and of a man who happened to be in the office at the time of Ristine's telephone conversation with Miss Redd, were introduced and they were likewise to the same general effect as that of Lyons' affidavit.

Plaintiff introduced the affidavit of the deputy sheriff who served the subpoenas on the witnesses from the coal mine, including the subpoena *duces tecum* on the bookkeeper and agent in charge of defendant's office in Wellington, and he identified the subpoenas and said he read the same to each of the witnesses therein named and told them they were summoned by the plaintiff for the *trial* of said case, and that he delivered a copy of the subpoena *duces tecum* to the agent and bookkeeper. These subpoenas were introduced in evidence and show that they were for the trial of the case.

An affidavit of Mr. Crimm, a lawyer officing in the same suite with Mr. Bush but having no connection

with the case, states that he never heard of the case until the morning of October 17th when he heard Miss Redd talking over the long distance telephone to Lexington; that he heard her during the entire conversation; that she did not say one word about a trial of the case, or a continuance of a trial but that her conversation dealt entirely with the question of a continuance of the taking of depositions; that he heard her ask if notice to take depositions had been served, and heard her ask that the taking of depositions be continued over till the following Thursday in order that Mr. Bush might be present at the taking of depositions; that he heard her say that attorneys always continued the taking of depositions when the attorney on the other side is engaged in the trial of a case and she asked that the taking of the depositions be continued over for a few days; that after saying something about Mr. Bush not having failed to live up to any agreements, she turned to affiant and said, "He will not agree to a continuance of the depositions and he is very evasive in his answers;" that she then called Nelson over the telephone and arranged to have him go to Lexington the next morning in reference to the matter.

An additional affidavit of Mr. Bush gave Rule No. 7 in the Jackson county circuit court, the same as set out in the amended motion, and this affidavit further stated that he was not acquainted with the rules of the circuit court of Lafayette county, and had never tried a case therein; that he was under the impression that the same rules for pleading applied in the Lafayette as in the Jackson circuit court; that he did not know the case was set for trial October 18th, he never had received a docket for the October term, the clerk did not send him one, and he thought he would receive notice of the setting of the case.

There was a sufficient allegation or showing of meritorious defense, at least enough to prevent defendant's motion being denied for want of such allegation; and there was also evidence introduced in an attempt to show

that deception and unfair dealing on the part of plaintiff's counsel had been undertaken and indulged in; also evidence relative to the manner in which the adjuster, or someone in behalf of either the insurance company or the defendant, had induced plaintiff's counsel to agree to submit plaintiff to the examination of an expert oculist selected and to be paid for by defendant, with the idea of compromise before any suit was instituted, and that after plaintiff had submitted to this examination, not only was no compromise ever intended or contemplated, but plaintiff's counsel were compelled to pay the $25 fee charged by the expert. So far as concerns the charges of deception and unfair dealing against plaintiff's counsel, in the attempt to secure the clerk's affidavit and in regard to the stenographer not taking down the evidence in support of plaintiff's case, and in saying to the court that counsel thought the defendant must be going to stand on the demurrer, we have studied the record carefully and are convinced there is nothing in these charges. No attempt was made to obtain an untruthful affidavit, nor was any attempt made to *prevent* the evidence from being taken down. All that plaintiff's counsel did in this regard was to reply in the negative to the court's inquiry whether they desired to have the stenographer take the evidence down, and later to inquire of the stenographer if it was being taken down. The remark about the defendant standing on its demurrer was not stated as a fact, nor did it have any influence or weight in causing the judgment to be entered or bring it about in any way. The court, notwithstanding counsel's idea that it would be useless to wait longer, did wait until after the train from Kansas City had come in before taking up the case. The question of whether anyone connected with defendant or its insurance company did entrap plaintiff's counsel into having to pay the $25 expert fee, after inducing them to submit plaintiff to an examination, has no particular bearing on the case save and except as being the *reason* for plaintiff's counsel not being willing to be courteous and extend any favors.

But if plaintiff's counsel otherwise had the right to insist on a trial of the case, this *reason* for refusing to continue it would cut no figure. So that the question whether the court's action in refusing to set the judgment aside is to stand or be disapproved must be determined from the evidence hereinabove set forth, and not from any acrimonious charges or counter-charges based upon any other evidence offered in the case.

It must be remembered that the question with us is not what we would have done had we been sitting in the place of the trial judge, but whether the evidence is such that we can disturb his ruling. In this case, the trial judge has *overruled* the motion to set aside the judgment. As said in Pry v. Hannibal, etc., R. Co., 73 Mo. 123, 125, "the question which arises is, whether the circuit court, in overruling the motions to set aside the judgment by default, acted arbitrarily or oppressively. The solution of this question depends mainly upon the fact whether defendant . . . has disclosed a good reason for not having appeared and filed his answer in time and whether the defense offered to be made was meritorious. Unless *both* of these matters appear *so clearly* as to *make it manifest* that the trial court, in overruling the motion, *exercised its discretion arbitrarily*, this court will not interfere." (Italics ours.) As said in Robyn v. Chronicle Pub. Co., 127 Mo. 385, 391, "It is only in case of an abuse of this discretion that this court will interfere." In the case of Hoffman v. London, 96 Mo. App. 184, 192, SMITH, P. J., said: "In such cases as this, courts have a very wide discretionary power which ought to be exercised in such a way as to promote the ends of justice as far as possible. But it would be very unsafe for this court to undertake to revise the mere errors of the trial courts in the mere exercise of their discretion and it ought not to be done except in cases where manifest injustice has resulted from their action." [See, also, Cotter v. Lake, 129 Mo. App. 702, 709; Parks v. Coyne, 156 Mo. App. 379, 391; Munroe v. Dougherty, 190 S. W. 1022; Walton v. Hurst, 199 S. W. 1043.]

The action of the trial court, in overruling the motion to set aside, shows that the court found that no basis was afforded for the idea that "depositions were to be taken." And a careful study of the record fails to disclose any reason for disagreeing with such conclusion on the part of the trial court. The bookkeeper, although claiming that he was somewhat confused by the fact that the subpoenas were signed by a notary public, would not swear he told the Vice-president that depositions were to be taken. On the contrary, the Vice-president says he called the adjuster, Nelson, and *asked him* whether the case was to be tried or whether it was for depositions; and the adjuster, contrary to what he should have known from the service papers and summons which he had turned over to Mr. Bush's office, said he was "positive the case was not going to be tried." What reason did he have to be *positive* the case was not set for trial? But he doesn't seem to have been so positive after all, for he called Miss Redd over the telephone and, within an hour, again told the Vice-president it was depositions and not a trial that was set for next day, and then the Vice-president telephoned the bookkeeper that it was for the taking of depositions. The adjuster's affidavit shows that when the Vice-president called him he gave it as his *"opinion"* that the subpoena was for deposition; that the Insurance Company hadn't been notified that the case was set for trial and he therefore *"concluded"* it was the taking of depositions, and he called Bush's office and, learning that Bush himself was engaged in court, he told Miss Redd he thought depositions were to be taken the next morning. When she asked him if he had a copy of the notice, he took it upon himself to *assume* it had been served down there, and he then telephoned the Vice-president that it "must be depositions" that were going to be taken; that Miss Redd told him she had called Col. Ristine but could get no satisfaction out of him.

Now, unless Col. Ristine, in his telephone conversation with Miss Redd, led her to believe that it was for

the taking of depositions and not for trial, what reason did any of these persons have for so thinking? But Miss Redd does not charge him with telling her depositions were to be taken. She says that from the conversation she *"concluded"* that such was to be done. The most that her evidence does is to assert that he did not *tell* her it was for a trial, and her evidence tends rather to show that in her conversation with him she *assumed* that depositions were to be taken. Even at that, she says that Col. Ristine's answers were "not satisfactory" and that he did advise her to get local counsel if Mr. Bush could not be there. Col. Ristine, on the contrary, says that she told him she had been informed that the witnesses had been summoned for the *trial of the case;* that he told her he would not agree to any continuance, that all of his witnesses were summoned for the *trial* and he would insist on a trial. And he is corroborated, as far as his part of the conversation goes, by three others. Manifestly, the trial court chose to accept his version of the conversation, and, in such case, we are not in a position to disagree therewith and say the trial court should have accepted hers.

Moreover, the defendant and all parties connected with the matter must be held to have known, from the summons and petition which they had, that the defendant had been served more than thirty days before the first day of the October term in a county of less than 40,-000 inhabitants, and that under section 1225, Revised Statutes 1919, in the absence of anything to the contrary, the case was *triable* at that term. The statute says that a defendant thus served shall demur or answer on or before the first day of the term unless longer time be granted by the court and that all suits in which the defendant is thus served "shall be determined at the term at which the defendant is required to appear unless continued for cause." Consequently, no good reason is shown to have existed for defendant, or any of the persons involved herein, thinking that the case would not be triable or set for trial at that term, and no ex-

cuse is shown for *negligently* assuming that witnesses had been subpoenaed merely to give their depositions. Indeed, we must accept the court's action on the motion to set aside as a finding that Ristine told Miss Redd the case was for *trial*.

It cannot be successfully maintained that judgment was prematurely entered on October 18th, or that defendant was not in default at that time. Under section 1225, Revised Statutes 1919, defendant was required to demur or answer on or before the first day. The demurrer, filed by permission of the court on the second day thereafter, relieved the defendant of being in default until it was overruled, which was done on Saturday, the 15th. Section 1229, Revised Statutes 1919, provides that: "Upon the decision of the demurrer, the plaintiff may amend or the defendant may withdraw his demurrer and answer. The amended petition, answer or reply shall be filed within such time as the court may prescribe." When, therefore, the demurrer was overruled and no application was made for time in which to reply, the defendant was in default and remained so when the judgment was rendered. [Montz v. Moran, 263 Mo. 252, 261.] "The time was exhausted for pleading when the case was called for trial." [Robyn v. The Chronicle Pub. Co., 127 Mo. 385, 391-2.]

The statute does not contemplate that the court, after overruling a demurrer, must, of its own volition, specify a time in which answer must be filed, and that, in the absence of any specified time, the court cannot proceed to render judgment. When the demurrer was overruled, no request was made for time in which to answer or plead, and the court did not act until the day on which the case was set for trial arrived, and then, there still being no answer, judgment was rendered.

There was no rule of court specifying any length of time in which an answer could be filed after the overruling of a demurrer to the petition; and in view of the requirements of sections 1225 and 1229, it is obvious why there was none. The statutes prescribe when the

answer shall be filed, and, under them, when a demurrer to a petition is overruled, an answer is due *instanter* unless defendant asks and obtains more time. And since the matter is thus governed by statute, it is not seen how it can be said that because the rules of court permitted motions, affidavits, exceptions to garnishee, reports, commissioner's reports in partition, and demurrer, answer or reply to any amended pleadings, to be filed within three days after the necessity therefor arose, therefore, "by a parity of reasoning" a defendant whose demurrer has been overruled and who had made no request for time to answer nor filed any answer prior to the time the case is reached and called for trial, is to be given three days in which to file answer. To so hold would, in the face of the statute, withhold the power of the court to act until three days had elapsed. However, it is manifest from defendant's own showing that the rules had no part or influence in the matter since they were not known and could not have induced action or inaction.

The fact that counsel was busily engaged in the trial of cases in Jackson county is likewise no reason for setting the judgment aside; nor is it ground compelling opposing counsel to agree to a continuance. Courtesies and favors to counsel can have no weight in the determination of the question before us. Besides, the case involved herein was set for trial before the cases counsel engaged in trying were set, and it, therefore, had precedence, if there be precedence anywhere.

A number of minor points are made, which we have investigated, but they are without merit. The failure of the court to have the stenographer take down the evidence cannot invalidate the judgment nor afford grounds for setting it aside. The statute merely requires the stenographer to attend the sessions of the court "under the direction of the judge thereof" and it was the court who directed the stenographer not to take the evidence. Objections directly or indirectly attacking the case on

its merits are not involved herein nor are they preserved so that they could be reviewed.

We have carefully gone over this record but are unable to find ground for interfering with the discretionary power of the trial court to act as it did. We cannot say, as a matter of law, that such discretion was not judicially exercised, or was abused, or that the court acted arbitrarily. Hence, as we view it, we must affirm the judgment. It is so ordered. All concur.